*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* IN RE ARESTEA A KAKARIS, D.D.S.

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS,

UNPUBLISHED
January 22, 2025
11:15 AM

Petitioner-Appellee,

v

No. 369996
Board of Dentistry
LC No. 23-010574

ARESTEA A. KAKARIS, D.D.S.,

Respondent-Appellant.

Before: N. P. HOOD, P.J., and REDFORD and MALDONADO, JJ.

PER CURIAM.

Respondent appeals as of right the order of the Michigan Board of Dentistry's Disciplinary Subcommittee (DSC) concluding that respondent violated MCL 333.16221(a) (negligence or failure to exercise due care) and (b)(*i*) (incompetence). We affirm.

## I. BACKGROUND

The two-count complaint filed by petitioner alleged that respondent treated a patient because his old dental implant had fallen out. Respondent placed a new implant with a cover screw and healing abutment. However, the patient had to come back one month later because the new implant got fully dislodged. The complaint further alleged that respondent failed to create a surgical flap to visualize the bone contours, which would confirm that the implant was completely seated in the bone. Although it was documented that the respondent planned to replace the implant after healing, the complaint alleged that respondent failed to place any bone grafting material to prepare the area for another implant. Respondent denied all the alleged violations.

Several witnesses testified at a hearing before an administrative law judge (ALJ). Dr. Stephen Harris, petitioner's expert, testified that respondent did not properly install the patient's implant and did not properly address the implant loss. Dr. Harris opined that respondent failed to

-1-

make appropriate records prior to the procedure. Dr. Harris testified that part of the standard of care involves record keeping of informed consent and a properly documented treatment plan. However, Dr. Harris testified that the treatment plan outlining the risks, the benefits, and all the costs, including patients' informed consent, were missing. Additionally, Dr. Harris testified that respondent's treatment plan lacked measurements in the dental x-rays and that the x-rays were insufficient for visualizing the area for implant placement. Further, the treatment plan lacked a method of providing the true position of the bone and its quality for proper implant placement. Dr. Harris opined that because respondent failed to get a thorough record of the contour of the bone, the implant placement was substandard, and it was negligent for respondent to perform the flapless technique.[1] A proper record should provide the shape of the hump or the gum.

Dr. Harris opined that respondent's handling of the failed site was also substandard because she neglected to address the actual bone site despite her intent to place another implant later. Additionally, she was negligent by advising the patient to allow the site to heal on its own before putting in another implant. Finally, Dr. Harris disagreed with the statement in Norman Betts's affidavit[2] that the x-rays did not demonstrate a distal defect and that the implant was placed in sufficient bone structure.

Respondent's expert, Dr. Huzefa Kapadia, testified that record keeping does not have a "standard of care" because every dentist is different in how they write their notes and keep their chart entries. Dr. Kapadia opined that the placement of the implant was proper, adding that the implant was placed correctly because the x-rays showed that the threads of the implant were covered in bone. He opined, if an implant was placed in insufficient bone, most of the threads would be exposed, meaning not embedded in a bone. Additionally, Dr. Kapadia clarified that a dentist can lift a gum to see the underlying bone by using a laser, a scalpel, or a blade. He further added that by looking at an x-ray, it is possible to see one area of the depth of the implant; but when you flap a tissue, meaning expose a bone, it is possible to see a platform where to place the implant. Dr. Kapadia also opined that informed consent does not need to be in writing. In his experience, if implants fail, they typically fail within a month or two months. Dr. Kapadia also opined that generally, when an implant fails, it is possible to replace the implant after the six-month healing time. He concluded that Dr. Kakaris's general treatment and placement of the implant were within the minimal standard of care.

Respondent testified that she has practiced general dentistry for 35 years. Respondent further testified that she knew she placed the implant in the correct bone because she used a measuring device to make sure that the hole is actually completed and has a wall all the way around the implant. Respondent testified in detail about the flap technique versus flapless as well as the difference between using a laser versus a scalpel. She testified that she uses a laser to cut instead of a scalpel because it provides a dry, clean, and more sterile environment for a surgery. She also uses a laser to make an incision to see the bone and if needed, to flap it. Respondent clarified that

---

[1] The flapless procedure involves drilling the implant when you cannot visualize the bone because you do not remove the gum tissue.

[2] Norman Betts is a licensed and board-certified oral and maxillofacial surgeon, who provided an affidavit but did not testify.

she performs an "envelope flap" technique. This technique involves a less-invasive laser "pull back" gum approach instead of an incision that peels the gum back completely. This approach does not require sutures but still allows a doctor to see the bone. Respondent explained that the use of a laser is a newer technique but it is not common among dentists. Respondent agreed that nobody would be able to see the bone by just looking at the x-rays done in this case.

Following the hearing, the ALJ entered his proposal for decision. The ALJ presented a detailed summary of the evidence and made findings of fact before concluding that petitioner proved by a preponderance of the evidence that respondent's record keeping, failure to "lay a flap," failure to clean the surgical site, and failure to place bone graft materials constituted negligence and incompetence in violation of MCL 333.16221(a) and (b)(*i*), respectively. After respondent filed exceptions to the ALJ's proposal for decision, the DSC issued a final order in which it accepted and adopted the ALJ's findings of fact and conclusions of law. Respondent was ordered to serve a one-year license limitation period, during which respondent was not allowed to perform any dental implant placement procedures, and she was fined $2,500. Additionally, respondent was placed on probation for one year. The terms of the probation required her to undergo continuing education and comply with the Public Health Code.

Respondent now appeals, arguing that the DSC's final order was not supported by competent and substantial evidence.

## II. ANALYSIS

Respondent argues that the final order is not supported by competent, material, and substantial evidence to establish that she violated MCL 333.16221(a) or (b)(*i*). We disagree.

Const 1963, art 6, § 28 provides that a court's review of an agency decision is limited to determining whether the agency action was authorized by law and whether the agency's findings of fact are "supported by competent, material and substantial evidence on the whole record." "[A] court must review the entire record and not just the portions supporting the agency's findings." *Dep't of Community Health v Risch*, 274 Mich App 365, 372; 733 NW2d 403 (2007). " 'Substantial evidence' means evidence that a reasonable person would find acceptably sufficient to support a conclusion." *In re Sangster*, 340 Mich App 60, 67; 985 NW2d 245 (2022). "This may be substantially less than a preponderance of evidence, but does require more than a scintilla of evidence." *Bureau of Prof Licensing v Butler*, 322 Mich App 460, 465; 915 NW2d 734 (2017). "[A]n appellate court must generally defer to an agency's administrative expertise." *Sangster*, 340 Mich App at 67. This Court may not set aside factual findings that are supported by the evidence simply "because alternative findings could also have been supported by evidence on the record or because the court might have reached a different result." *Id*. at 373.

MCL 333.16221 provides several violations or grounds that can result in disciplinary proceedings against a licensed professional. MCL 333.16221 provides, in relevant part:

> [T]he department shall investigate any allegation that 1 or more of the grounds for disciplinary subcommittee action under this section exist, and may investigate activities related to the practice of a health profession by a licensee, a registrant, or an applicant for licensure or registration. The department may hold hearings,

administer oaths, and order the taking of relevant testimony. After its investigation, the department shall provide a copy of the administrative complaint to the appropriate disciplinary subcommittee. The disciplinary subcommittee shall proceed under section 162261 if it finds that 1 or more of the following grounds exist:

     (a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.

     (b) Personal disqualifications, consisting of 1 or more of the following:

     (*i*) Incompetence.

" 'Incompetence' means a departure from, or failure to conform to, minimal standards of acceptable and prevailing practice for a health profession, whether or not actual injury to an individual occurs." MCL 333.16106(1).

Respondent essentially argues that the ALJ's findings were erroneous and that the ALJ should have given more weight to the evidence presented by her and her witnesses. Respondent also argues that record keeping is not a crucial part of the standard of care for dentists and that the application of record keeping standards by the ALJ was incorrect. Conversely, respondent argues that her own testimony that each practitioner has its own method of record keeping, which varies from dentist to dentist, was sufficient to establish that respondent was not negligent or incompetent. However, the ALJ found that respondent's and Dr. Kapadia's testimonies were not as detailed or credible as Dr. Harris's. We defer to the ALJ's credibility determination because when "administrative findings of fact and conclusions of law are based primarily on credibility determinations, such findings generally will not be disturbed because it is not the function of a reviewing court to assess witness credibility or resolve conflicts in the evidence." *Risch,* 274 Mich App at 372.

Moreover, respondent's argument that record keeping is not crucial, directly undermines her argument that the ALJ should have found that she was able to see the bone by using an "envelope flap" technique. The ALJ found that respondent used a "flapless" technique because there was no record "that she had used any sutures to close up the wound." Plus, the ALJ found on the basis of Dr. Harris's testimony that a laser can be used to "clear around a little circle with a little hole of where you are going to put your drill" so that if respondent did open a flap, she could see a small portion of the bone through the hole made with the laser. However, the ALJ concluded that respondent did not make "any type of a flap and retracted the tissue to visualize the entire area of the bone." As noted previously, we do not disturb the ALJ's credibility determinations. *Risch,* 274 Mich App at 372.

Respondent also argues that the ALJ's finding that she did not have a treatment plan and consent form was not supported by the evidence. Specifically, she testified that she had a "very

basic treatment plan" with LC that proposed installation of the two implants. The plan suggested a limited number of x-rays in order to minimize cost. Respondent explained that a treatment plan varies from dentist to dentist, and according to respondent, the purpose of a treatment plan is "to establish a financial cost." As for the consent issue, respondent testified that she considers the "consent" requirement met when the client pays for the treatment and when the client sits in the chair to allow her to perform the services. Respondent testified that, per her standard practice, she did not ask for an official consent form to be signed. However, the ALJ found that respondent did not obtain a proper written consent from the patient because it lacked x-rays measuring where the implants were going to be placed. The ALJ further found that the standard of care requires the dentist's documentation to have "accurate measurements, accurate radiographs, an accurate representation of where that dentist plans to place that implant, and ultimately what the dentist is trying to accomplish in their treatment." The ALJ concluded that respondent's treatment was incompetent and that it violated MCL 333.16621(b)(*i*) by failing to properly ascertain whether the bone structure was sufficient before placing the implant. Because respondent did not address the failed implant site and lack of bone grafting material, the ALJ concluded that respondent demonstrated incompetence, and therefore, respondent failed "to conform to minimal standards of acceptable and prevailing practice, in violation of MCL 333.16221(b)(*i*)."

Additionally, Dr. Harris's testimony that a dental implant generally does not fall out on its own within a month after placement and that there was nothing in the patient's chart to suggest that the patient was responsible for the failure of the implant went uncontested. Moreover, Dr. Harris offered several explanations as to why an implant might fail. He stated an implant might fail for lack of quality of bone. Additionally, a faulty bone grafting material can cause a bone to fail from ingrowth or ingress of gum tissue caused by bacteria. Dr. Harris opined that a patient can cause an implant to fail by overloading their bite or grinding teeth, in other words, putting more pressure side to side on an implant causing an overload of pressure that a bone interface cannot handle. Additionally, Dr. Harris opined that a patient's own health cannot affect whether an implant may fail. However, Dr. Harris believed that the quality of the implant procedure can affect whether an implant will succeed or fail, and if the implant procedure is done correctly, this increases the likelihood of the implant procedure's success. Even taking respondent's testimony as credible, the record reflects that the patient did not cause the implant failure. Respondent also did not dispute Dr. Harris's opinion that an implant does not fail on its own, and respondent did not offer a plausible reason why the implant failed. The ALJ stated that although Dr. Kapadia's testimony suggested that a bone graft is "optional," the ALJ agreed with Dr. Harris' testimony that it was negligent for respondent not to use bone grafting.

Therefore, the Disciplinary Subcommittee did not err by adopting the ALJ's findings of fact and conclusions of law and by issuing a final order regarding respondent's violations of the Public Health Code.

Affirmed.

/s/ Noah P. Hood
/s/ James Robert Redford
/s/ Allie Greenleaf Maldonado